# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MP NEXLEVEL OF CALIFORNIA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>CVIN, LLC, et al.,<br><br>Defendants. | 1:14-cv-288-LJO-GSA<br><br>MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTIONS TO DISMISS (Docs. 89, 91) |

## I. INTRODUCTION

This case concerns disputes that arose over a large-scale broadband infrastructure construction project ("the Project") throughout California's Central Valley. *See* Plaintiff's Second Amended Complaint ("SAC"), Doc. 84 at ¶ 1. The goal of the Project is to create an approximately 1,371-mile broadband fiber network through 18 Central Valley counties. *Id.* at ¶ 22.

Because of various ongoing disputes that arose during the construction of the Project, Plaintiff MP Nexlevel ("MP") brought this suit against Defendant CVIN, LLC ("CVIN") d/b/a Vast Networks, and Defendant Corporation for Education Network Initiatives in California ("CENIC"), a non-profit corporation. MP alleges CVIN is composed of the following ten separate telecommunications companies: Calaveras Communications Company; Sebastian Enterprises, Inc.; Volcano Communications Company; Stageline Communications, Inc.; The Ponderosa Telephone Company; Sierra Tel Communications Group; Varnet, Inc.; Cal-Ore Telephone Company; Ducor Telephone Company; and Consolidated Communications Holdings, Inc. (collectively, "the Member Defendants"). SAC at ¶ 10.

MP brings 47 claims against CVIN based on disputes concerning the construction of the Project.

1  MP asserts its claims against the Member Defendants on the ground they are CVIN's alter egos and

2  against CENIC on the ground it is CVIN's partner under California Corporations Code § 16308(a)

3  ("§ 16308(a)[1]").

4     CENIC and Member Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6). Docs.

5  89, 91. Pursuant to Local Rule 230(g), the Court rules on the papers without oral argument. For the

6  reasons discussed below, the Court GRANTS WITHOUT LEAVE TO AMEND CENIC's motion to

7  dismiss and DENIES Member Defendants' motion to dismiss.

8              **II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>[2]**

9     MP filed suit against Defendants on February 28, 2014. Doc. 2. On April 22, 2014, MP filed a

10 first amended complaint. Doc. 44. On May 27, 2014, Defendants filed motions to dismiss, which the

11 Court granted with leave to amend on July 7, 2014. *See* Doc. 83. On July 25, 2014, MP filed the SAC,

12 currently the operative complaint. Doc. 84.

13    MP asserts 47 causes of action against Defendants[3] and seeks approximately $18 million in

14 damages that it alleges it is owed from Defendants. SAC at ¶ 1. MP alleges that CENIC is liable to MP

15 as CVIN's partner and that the Member Defendants are liable to MP as CVIN's alter egos.

16    CENIC and the Member Defendants have moved to dismiss the SAC in its entirety on the ground

17 that it fails to allege facts that would support MP's theories as to their respective liability. Docs. 89, 91.

18 Accordingly, CENIC's and the Member Defendants' respective motions to dismiss only address those

19 theories of liability; they do not discuss in any detail MP's individual causes of action. The Court

20 therefore need not discuss MP's claims in extensive detail.

21 **A.     <u>MP's Allegations as to CENIC's liability as CVIN's Partner.</u>**

22

23 [1] MP appears to bring its claims against CENIC under § 16308(a)-(b). *See* SAC at ¶ 130. Partnership by estoppel arises under § 16308(a). *See In re Athar*, No. 1:11-bk-23947-MT, 2014 WL 806196, at *4 (Bankr. C.D. Cal. Feb. 27, 2014). The Court construes MP's claims against CENIC to have been brought under § 16308(a).

24 [2] The background facts are derived from the complaint. The Court accepts the factual allegations as true for purposes of this motion. *Lazy Y. Ranch LTD. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

25

26 [3] MP's first cause of action, titled "CENIC's Liability Under California Corporations Code § 16308," is composed of allegations concerning MP's theory of CENIC's liability for MP's remaining causes of action. MP does not provide, and the Court cannot find, any authority that stands for the proposition that § 16308 provides a standalone cause of action.

"Construction of the Project was broken down and bid out and/or negotiated by CVIN in 30 segments" ("the segments"). SAC at ¶ 28. In November 2011, MP "was awarded a bid to work as one of CVIN's direct contractors on the Project." *Id.* at ¶ 30. Between November 2011 and the present, MP entered into 14 contracts ("the contracts") with CVIN to participate in the construction of the Project. *See* SAC at ¶¶ 1, 30-35. When "CVIN awarded the contracts to [MP], CVIN assured [MP] both orally and in writing that CVIN would promptly pay all progress payments and promptly approve and pay all change order requests." *Id.* at ¶ 34. CVIN made a number of other assurances "[i]n the bidding instructions incorporated into each of the Contracts." *See id.* at ¶ 35(A)-(F).

"CVIN, along with CENIC as joint applicant, pursued federal and state funding to develop" the Project ("the grant funding").[4] *Id.* at ¶ 8. MP alleges that CVIN and CENIC "rushed through the process of applying for" the grant funding and, as a result, the "design and engineering of the Project was incomplete, inadequate and materially deficient." *Id.* at ¶ 38. These deficiencies caused disagreements between the parties that, according to MP, ultimately resulted in CVIN wrongfully terminating MP from work on certain of the segments. *Id.* at ¶ 43. MP claims that "CVIN's overall mismanagement of the Project" prevented MP's "timely and efficient completion of the Project segments." *Id.* at ¶ 46.

MP alleges numerous ways in which CVIN mismanaged the Project and failed to abide by the contracts' terms. *Id.* at ¶ 47(A)-(N). Simply stated, MP alleges that CVIN's conduct materially breached the contracts and violated various statutes. *See id.* at 1-2.

MP asserts that CVIN and CENIC were in a legal partnership such that CENIC should be liable for CVIN's alleged conduct as CVIN's partner. As proof of their purported partnership, MP points to, among other things, the joint application by CVIN and CENIC for the grant funding and various representations they made. *See id.* at ¶¶ 79-94, 132-38. "CVIN, along with its partner CENIC" submitted an application for the grant funding ("the grant application"). *Id.* at ¶ 79. On the grant application,

---

[4] The grant funding came from two grants and totaled approximately $53 million. One grant was from the National Telecommunications and Information Administration ("the NTIA Grant") was for approximately $46.6 million. SAC at ¶¶ 37, 96. The other grant was from the California Public Utilities Commission ("PUC Grant") and totaled approximately $6.7 million. *Id.* at ¶ 100.

"CENIC was named as a proposed sub-recipient of the grant" by CVIN, *id.* at ¶ 80, and represented that CVIN and CENIC were in a "public-private partnership." *Id.* at ¶ 82. In the grant application, the CVIN and CENIC represented that "CVIN/CENIC will build [the Project]," and that "in a public-private partnership, [CVIN] and [CENIC] will build, operate and maintain [the Project]." *Id.* at ¶ 83.

MP alleges that CVIN and CENIC made "representations in the [grant application], websites, and elsewhere" that demonstrate they were in a legal partnership. *Id.* at ¶ 93. CVIN represented to "various institutions" that "CVIN and CENIC had submitted an application" for the grant funding. *Id.* at ¶ 85. "CENIC announced on its website that the 'CVIN/CENIC Central Valley Broadband Project Receives [the grant funding].'" *Id.* at ¶ 87. The announcement also stated that "the Project 'was designed and developed by the public-private partnership of [CVIN] and [CENIC] . . . a non-profit corporation." *Id.* CVIN's website also stated that "CENIC . . . together with its private sector partner CVIN . . . have put together a project plan designed to improve the availability of broadband networking infrastructure for 18 counties within the California Central Valley area." *Id.* at ¶ 88. "In the specifications for the Project, signage that included CENIC's logo among the other funding agencies for the Project was required to be placed." *Id.* at ¶ 92.

"The 2014 First Quarter Statement," which was submitted after MP's first amended complaint, *id.* at ¶ 136, stated that "[o]nce the Project is complete, the services provided to Anchor Institutions will be managed by our partner, [CENIC] who is a sub-recipient." *Id.* at ¶ 91. "[T]he services provided to Anchor Institutions[5] will be managed by CENIC while CVIN will manage all commercial services to third-party providers, business and residential customers." *Id.* at ¶ 90.

"Both CVIN and CENIC, by words on grant applications, in websites and elsewhere, and by their conduct in jointly applying for grants, held themselves out as partners or in a partnership." *Id.* at ¶ 132. "Neither CENIC nor CVIN disclaimed . . . their representations of being in a partnership." *Id.* at ¶ 134. "Neither CVIN nor CENIC took any steps to publicly deny the many statements of their

---

[5] MP does not explain who or what the "Anchor Institutions" are in the SAC or in its oppositions.

4

partnership or clarify the true nature of their relationship." *Id.* at ¶ 89. MP therefore claims that "[b]ecause CENIC and CVIN presented themselves to the outside world as a partnership, CENIC has liability . . . even if CENIC is not an actual partner to CVIN in the Project." *Id.* at ¶ 133. MP alleges that "CENIC and CVIN's representations, and course of conduct indicating that they were partners, along with MP's reasonable reliance on the same adequately supports liability of CENIC." *Id.* at ¶ 138.

**B.    MP's Allegations as to the Member Defendants' Liability as CVIN's Alter Egos.**

MP asserts that the Member Defendants are liable for CVIN's conduct because they are CVIN's alter egos. MP alleges that the Member Defendants are separate entities that collectively make up CVIN, *see id.* at ¶¶ 10, and that "CVIN is a shell company which its LLC members formed and capitalized as needed for the purpose of developing telecommunications capabilities generally and, more recently, to serve as the developer for [the Project]." *Id.* at ¶ 9. CVIN was, however, "grossly undercapitalized in relation to the costs and risk presented by the Project." *Id.* at ¶ 101. "[A]s the sole shareholders of CVIN, [the Member Defendants] knew that, at the time the Project began, CVIN was undercapitalized and would be unable to pay for the actual costs of the Project." *Id.* at ¶ 102. MP alleges that the Member Defendants intentionally kept CVIN undercapitalized, *id.* at ¶ 112, though they "had the opportunity, right, and ability to properly capitalize CVIN." *Id.* at ¶ 103.

MP claims that the Member Defendants, not CVIN, are the true beneficiaries of the Project. *Id.* at 18; *id.* at ¶¶ 123, 125. "[T]he Member Defendants plan to service some or all of the broadband service contracts entered into by CVIN." *Id.* at ¶ 113. Consolidated Communications, one of the Member Defendants, "has reported in its quarterly report" that it has "a 12.86% interest in [CVIN], a joint enterprise comprised of affiliates of several independent telephone companies." *Id.* at ¶ 115. Consolidated Communications further reported that "[b]ecause [it has] significant influence over the operating and financial policies of this entity [i.e., CVIN], [it] account[s] for this investment using the equity method." *Id.* "In its other quarterly reports in 2013, Consolidated Communications affirmed its partnership with CVIN and its ownership interest and 'significant influence over the operating and financial policies' of CVIN." *Id.* at ¶ 116. "In its 2014 quarterly report, Consolidated [Communications]

1  reported a 13.455% interest in [CVIN], and repeated its previous statements that it has significant

2  influence over the operating and financial policies of CVIN." *Id.* at ¶ 117.

3        MP alleges that "CVIN and CENIC rushed through the process of applying for [the grant] . . .

4  without sufficient inquiry to ensure that their projected Project cost calculations and engineering studies

5  were accurate and/or had a basis in fact." *Id.* at ¶ 37. MP further alleges that CVIN and CENIC

6  "intentionally concealed the fact that they had rushed through [the grant application] process." *Id.* at ¶

7  40. As a result, "the design and engineering of the Project was incomplete, inadequate and materially

8  deficient," *id.* at ¶ 38, which "led to Project delays, impacts, and cost overruns." *Id.* at ¶ 39. "CVIN's

9  latest statement for the first quarter of 2014 . . . shows that the Project is substantially over budget and

10  behind schedule." *Id.* at ¶ 76.

11        The Project's total cost was projected to be approximately $66.6 million, 20% of which "was to

12  come from 'in kind' contributions from CVIN and its members." *Id.* at ¶ 96.  CVIN's assets at the time

13  the Project began were approximately $1.3 million. *Id.* at ¶ 97. CVIN thus began the Project with total

14  assets that were less than 10% of the total estimated cost of the Project.

15        The Member Defendants knew of the Project's cost overruns as its construction progressed "and

16  knew that CVIN was not properly acknowledging the construction cost overruns that it was actually

17  experiencing." *Id.* at ¶ 110. The Member Defendants "knew, during the execution of the Project, that

18  CVIN lacked, and without action on their part would continue to lack, funds to pay for the Project." *Id.*

19  at ¶ 111. Due to the "intentional actions and inactions of [the Member Defendants], CVIN is

20  substantially undercapitalized and without assets sufficient to meet its debts." *Id.* at ¶ 124. The Project's

21  cost overruns are projected to exceed $12 million. *Id.* at ¶ 107; *see also id.* at ¶¶ 106-07. "CVIN's 2013

22  Third Quarter Statement also shows that CVIN has exhausted the NTIA Grant funds, the primary source

23  of funds to pay for the Project." *Id.* at ¶ 109. Thus, MP alleges that the Member Defendants began the

24  Project knowing that CVIN was undercapitalized, that they intentionally kept CVIN undercapitalized,

25  and that CVIN's undercapitalization worsened as the Project progressed, yet the Member Defendants

26  intentionally failed to capitalize CVIN. *Id.* at 15, ¶¶ 101, 110, 112, 122-23.

MP asserts that the Member Defendants "used the corporate entity of CVIN to contract with [MP] with intent to avoid performance and attempt to use CVIN as a shield against Member Defendants' liability." *Id.* at ¶ 119. MP maintains that the "Member Defendants control all of the shares of CVIN," *id.* at ¶ 121, and "as the sole shareholders in CVIN," the Member Defendants used CVIN "to shield themselves from the risks inherent [in the Project]." *Id.* at ¶ 123.

MP asserts that "[b]ecause the Member Defendants have used CVIN as a mere shell, instrumentality, and conduit [for the Project] whose sole real beneficiary was the Member Defendants, there is such a unity of interest and ownership between CVIN and the Member Defendants that no separation actually exists." *Id.* at ¶ 127. Likewise, MP alleges that no separation actually exists between CVIN and the Member Defendants "[b]ecause the Member Defendants have used CVIN to conduct the business of another corporation—the Member Defendants'—by virtue of using CVIN to construct a project whose true users and beneficiaries are the Member Defendants." *Id.* at ¶ 128.

### III. <u>STANDARD OF DECISION</u>

A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. A 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at

7

556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, the plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## IV. **DISCUSSION**

### A.    **CENIC'S Motion to Dismiss.**

CENIC moves to dismiss all of MP's causes of action on the ground none states a valid claim. *See* Doc. 89 at 8. CENIC argues that the SAC fails to allege facts that demonstrate CENIC should be held liable for CVIN's conduct as CVIN's purported partner under California Corporations Code § 16308 ("§ 16308(a)"). *Id.* CENIC argues—and MP does not dispute—that all of MP's claims are contingent on a finding that a legal partnership exists between CVIN and CENIC under § 16308(a). *Id.*; *see also* Doc. 100 at 3, 9. Accordingly, to resolve CENIC's motion to dismiss, the Court need only determine whether the SAC alleges sufficient facts for MP to proceed against CENIC on the theory that CVIN and CENIC are partners.

### 1.    **Partnership Under § 16308(a).**

To succeed on its claims, MP bears the burden of proving by a preponderance of the evidence that a partnership exists between CVIN and CENIC. *See In re Lona*, 393 B.R. 1, 11 (Bankr. N.D. Cal.

8

1   July 9, 2008). Under § 16308(a), "where there is insufficient evidence of an actual partnership,

2   partnership liability may arise by estoppel."[6] *In re Athar*, No. 11-bk-23947, 2014 WL 806196, at *7

3   (Bankr. C.D. Cal. Feb. 27, 2014). Partnership by estoppel occurs where the acts of the ostensible or

4   purported partner are "factually and legally sufficient to lead another person to believe he was a

5   copartner and assumed responsibility for such." *J.C. Wattenbarger & Sons v. Sanders*, 216 Cal. App. 2d

6   495, 500-01 (1963). "The purported partner is liable to the person to whom the representation is made if

7   that person, relying on the representation, enters into a transaction with the alleged partnership." *In re*

8   *Lona*, 393 B.R. at 16-17 (citing § 16308(a)). However, "the conduct of the ostensible partner must be

9   sufficient to induce a reasonable and prudent person to believe that a partnership exists and for that

10  person to enter into a transaction in reliance on that belief." *Id.* (citing *Armato v. Baden*, 71 Cal. App.

11  4th 885, 898 (1999)). In the context of a motion to dismiss, the complaint must plead sufficient facts that

12  would support a finding that a purported partnership exists. *See Moen v. Art's Café*, 95 Cal. App. 2d

13  577, 579 (1950).

14       For instance, in *J&J Builders Supply v. Caffin*, 248 Cal. App. 2d 292, 298 (1967), the court

15  affirmed the trial court's finding that the defendant was liable to the plaintiff as the purported partner of

16  another ("Jeffrey") due to the defendant's conduct. In front of the plaintiff, Jeffrey said "This is my new

17  partner . . . . [W]e are going to go into a new business . . . . [We are] going to go out after tract work and

18  operate on a larger scale . . . We are going to do a lot of work, and [the defendant] has got a lot of

19  money, is going to throw a lot of money into the business." *Id.* at 294. The defendant said nothing in

20  response to Jeffrey's comments. *Id.* The defendant later told the plaintiff's representative, "I always call

21  anybody that I go in business with my partner no matter what the deal is." *Id.* Jeffrey later obtained

22  credit from the plaintiff "by holding out himself and [the defendant] as copartners doing business" under

23  a fictitious corporate name. *Id.* at 296. The court held that the defendant's "failure to deny [his purported

24  partner's] statements of partnership, coupled with his later admission that he had held himself out to the

25   

26  [6] Courts interchangeably use the terms "ostensible partnership," "purported partnership," and "partnership by estoppel." *Armato v. Baden*, 71 Cal. App. 4th 885, 897 n.4 (1999).

1  plaintiff as a partner, and the extension of credit to the defendants" was sufficient to hold the defendant

2  liable as Jeffrey's purported partner. *Id.* at 298.

3       The court in *J&J Builders* discussed *Singh v. Kashian*, 124 Cal. App. 2d Supp. 879 (1953), "[t]he

4  case most closely in point." *Id.* The court summarized the case as follows:

> Joseph, a bail broker, arranged for the execution of a property bond for $1,000 by Kashian and
> Shuklian to free Lahab Singh from custody. One B. Ishar Singh deposited $1,000 cash with the
> broker. An arrangement was made for a substitution of Samond Singh's cash for B. Ishar Singh's
> deposit. Joseph, Ishar, Samond, Kashian, and Shuklian met at Joseph's office. Joseph stated in
> the presence of Kashian and Shuklian and the plaintiff Singh that he, Kashian, and Shuklian were
> partners. The "partners" made no denial. In the presence of Kashian and Shuklian, Joseph
> delivered a receipt for $1,000 to Samond, signed "Mike Kashian and A. Shuklian, by Aram
> Joseph." The court concluded that upon these facts a reasonable inference arose that the plaintiff
> relied upon the representations of partnership in paying over his money to the defendants. The
> court held that the evidence was sufficient to sustain the judgment against Kashian and Shuklian
> on [a theory of partnership by estoppel].

11  *Id.*

12       Similarly, a partnership by estoppel was found *Redman v. Walters*, 88 Cal. App. 3d 448 (1979).

13  In that case, the plaintiff employed the law offices of "MacDonald, Brunsell & Walters" ("the law

14  firm"). *Id.* at 450. The plaintiff advanced the law firm $1,000 to file the suit, which it did, with the law

15  firm designated as attorneys of record. *Id.* at 450-51. A year later, one of the law firm's partners,

16  Walters, left to practice elsewhere. *Id.* at 451. Walters was not formally substituted as an attorney of

17  record in the plaintiff's case, and the plaintiff "was never advised of the changed names, or attorneys . . .

18  [and] never consented to any change or substitution of attorneys." *Id.* Approximately four years later, the

19  plaintiff's lawsuit was dismissed "for failure to bring it to trial within five years." *Id.* The plaintiff sued

20  the law firm, including Walters, for its negligent handling of his law suit. *Id.* The court held that, with

21  regard to the plaintiff, the law firm of "'MacDonald, Brunsell & Walters' was . . . an ostensible

22  partnership or partnership by estoppel." *Id.* at 452.

23       Conversely, no partnership by estoppel existed in *Armato v. Baden*, 71 Cal. app. 4th 885 (1999).

24  The defendants were "all doctors who were working part-time as independent contractors for Managed

25  Care Orthopedic Medical Group (Managed Care), but who did not treat plaintiff." *Id.* at 888. The

26  plaintiff allegedly received negligent medical treatment from Managed Care. *Id.* at 889. The plaintiff

sued the defendants on the ground they were the purported partners of Managed Care and its physicians. *Id.* In support, the plaintiff argued that, among other things, the defendants were the purported partners of Managed Care and its physicians because they "permitted their names to be listed on the door to the Managed Care office, and perhaps on appointment cards and prescription pads." *Id.* at 898. The court rejected the plaintiff's argument, holding that "[t]he listing of [the defendants'] names in connection with the Managed Care office is insufficient as a matter of law to establish any . . . ostensible partnership between" them and Managed Care and its physicians. *Id.* The court further held that "the mere listing of [the defendants'] names in the places and in the manner alleged by appellant does not reasonably induce a belief that" they are partners with Managed Care or its physicians. *Id.* at 899.

> **2.**    **MP's Allegations as to the Existence of a Purported Partnership Between CVIN and CENIC.**

MP asserts that the SAC provides sufficient facts to demonstrate that CVIN and CENIC are purported partners under § 16308(a). MP argues a partnership by estoppel exists between CVIN and CENIC for three primary reasons: (1) CVIN and CENIC publicly represented in the grant application and on their websites that they were in a "partnership"[7]; (2) CVIN and CENIC jointly applied for the grant funding; and (3) CVIN and CENIC represented that they would jointly build, operate, maintain, and manage the Project. *See* Doc. 100 at 2-4. And because of this conduct, "MP relied, in part, on the representations of both CVIN and CENIC that [they] were in a partnership and would jointly build and operate the Project." SAC at ¶ 94; *see also id.* at ¶¶ 83, 84, 87, 88, 93.

In its opposition, MP merely recites allegations from the SAC that, in its view, demonstrate that CVIN and CENIC are partners. *See* Doc. 100 at 2-5. MP also explains its position as to why some, but not all of the authority on which CENIC relies does not support CENIC's position that no partnership exists between it and CVIN. *See id.* at 6-8. Notably, MP provides no authority to support its position that

---

[7] In its motion to dismiss, CENIC argues that the Project's requirement that CENIC's logo be placed on the Project's specifications is not dispositive. *See* Doc. 89 at 11-12 (citing SAC at ¶ 92). To the extent MP argues that the requirement that CENIC's logo be placed on the Project's specifications is evidence of a partnership between CVIN and CENIC, *see* Doc. 100 at 4 (citing SAC at ¶ 92), the Court disagrees. *See Armato*, 71 Cal. App. 4th 898 (holding that office sign listing defendants' names was "insufficient as a matter of law to establish any . . . ostensible partnership between [them]").

the SAC provides sufficient facts for the Court to find that a partnership exists between CVIN and

CENIC under § 16308(a). *See* Doc. 100 at 2-5.

MP alleges CVIN and CENIC represented in the grant application and on their websites that they

were "partners" or were in a "partnership." *See, e.g.*, SAC at ¶¶ 83, 84, 87, 88, 93. As other courts have

noted, the term "partnership" has a colloquial meaning that describes a relationship unlike "a legal

partnership of the sort that gives rise to fiduciary duties." *Love v. The Mail on Sunday*, 489 F. Supp. 2d

1100, 1108 (C.D. Cal. 2007), *aff'd*, 611 F.3d 601 (9th Cir. 2010); *see also T.G. Plastics Trading Co.,*

*Inc. v. Toray Plastics (America), Inc.*, 958 F. Supp. 2d 315, 327 (D.R.I. 2013) ("Use of the word

'partner' in the colloquial sense does not establish a legal partnership.").

The Court acknowledges that case law analyzing and applying § 16308(a) is limited.

Nonetheless, MP does not provide—and the Court cannot find—any authority holding that two parties

*publicly* describing themselves as "partners" or describing their relationship as a "partnership" is

sufficient, without more, to establish a legal partnership, as MP suggests. Moreover, the SAC's

allegations indicate that CVIN and CENIC used the words "partner" and "partnership" in the colloquial

sense of the word.[8]

Likewise, MP does not provide—and the Court cannot find—any authority holding that two

parties jointly applying for and receiving federal grant funding, in and of itself, evinces a legal

partnership, as MP suggests. *See* Doc. 100 at 3; SAC at ¶¶ 37, 79-86. Similarly, MP does not provide—

and the Court cannot find—any authority holding that a collaboration between two parties to jointly

build a project, in and of itself, evinces a legal partnership, as MP suggests. *See* SAC at ¶¶ 90, 91, 93.

The Court therefore finds that the SAC does not allege sufficient facts to establish the existence

of a partnership by estoppel between CVIN and CENIC under § 16308(a). *See J.C. Wattenbarger*, 216

---

[8] The Court's analysis might be different if, for instance, CVIN or CENIC made affirmative representations directly to MP
that CVIN and CENIC were "partners" and one or both of them failed to clarify the nature of their relationship. *See J&J*
*Builders*, 248 Cal. App. 2d at 298 ("[The defendant's] failure to deny Jeffrey's statements of partnership, coupled with his
later admission that he had held himself out to the plaintiff as a partner, and the extension of credit to the defendants in the
fictitious name which each led the plaintiff to believe was the firm name of the copartnership, were sufficient to sustain the
liability of [the defendant] as an ostensible partner of Jeffrey's.").

Cal. App. 2d at 500-01 (purported partnership determined based on "whether the acts and conduct of an individual were factually and legally sufficient to lead another person to believe he was a copartner and assumed responsibility as such"); *Armato*, 71 Cal. App. 4th at 898-99.  Accordingly, MP's claims against CENIC fail.

### 3. MP's Allegations as to MP's Reliance on CVIN and CENIC's Representations and Conduct.

In addition to alleging sufficient facts to demonstrate that MP reasonably believed a partnership existed between CVIN and CENIC—which MP does not do—MP must allege sufficient facts showing that it reasonably relied on that belief when entering into the contacts. *See In re Lona*, 393 B.R. at 17. The Court finds that the SAC fails to do so. Accordingly, MP's claims against CENIC fail for the additional reason that MP's alleged reliance on the conduct and representations of CVIN and CENIC was unreasonable.

First, the SAC's only allegations as to MP's reliance are conclusory and devoid of factual support. MP alleges that "[i]n submitting bids and entering into contracts to perform work on the Project, [MP] relied, in part, on the representations of both CVIN and CENIC that [they] were in a partnership and would jointly build and operate the Project." SAC at ¶ 94.[9] MP further alleges that its "reasonable reliance on [CENIC and CVIN's representations and conduct] adequately supports liability of CENIC per § 16308." *Id.* at ¶ 138.

Second, regardless of the SAC's conclusory allegations, the SAC's allegations as a whole demonstrate that MP's alleged reliance was unreasonable. To find that MP's alleged reliance was reasonable would require the Court to find that MP reasonably believed that CENIC would assume CVIN's millions of dollars of contractual liability based on the parties' joint grant application and their representations of being "partners" or in a "public-private partnership" in that application and on their websites. The Court is unaware of any authority that would support that finding.

---

[9] MP essentially reiterates this allegation elsewhere in the SAC. *See* SAC at ¶ 135 (MP "reviewed both CENIC's and CVIN's representations of their partnership and reasonably relied on those representations when deciding on whether to submit bids or enter into contracts on the Project").

Notably, MP provides no authority in its opposition for its position that it reasonably believed a partnership existed between CVIN and CENIC or that it reasonably relied on that belief when entering into the contracts. *See* Doc. 100 at 1-5. MP's alleged reliance appears particularly unreasonable given that MP alleges the following: MP entered into 14 contracts with CVIN only under which MP was CVIN's direct contractor, SAC at ¶ 30, 32; CVIN awarded the contracts and CVIN assured MP orally and in writing that *CVIN alone* would pay what was due under the contracts, *id.* at ¶ 34; and CVIN, not CENIC, allegedly "wrongfully refuses to comply with the payment terms of the Contracts." *Id.* at ¶ 63. Further, MP does not allege that it had any direct interactions with CENIC when negotiating or entering the contracts with CVIN or that CVIN made any representations to MP as to CENIC's involvement with the contracts.

Where courts have found that a plaintiff reasonably relied on a belief that the defendant was in a partnership with another person or entity, the defendant and/or the purported partner, at the very least, represented *to the plaintiff* that a partnership existed. *See, e.g.*, *J&J Builders*, 248 Cal. App. 2d at 298; *Kashian*, 124 Cal. App. 2d Supp. at 879; *Redman*, 88 Cal. App. 3d at 451-52. Further, in those cases, the defendant and/or the purported partner did not deny or clarify the representations of partnership. Moreover, the purported partners' conduct suggested that a partnership existed. In both *J&J Builders*, 248 Cal. App. 2d at 296, and *Kashian*, 124 Cal. App. 2d Supp. at 884, the purported partnership extended credit to the plaintiff. In *Redman*, an attorney who left a firm was nonetheless held to be a purported partner of the firm as to the plaintiff because he remained designated as the plaintiff's attorney of record and neither he nor the firm apprised the plaintiff of his departure from the firm. 88 Cal. App. 3d at 451. The court found that the plaintiff's reliance was reasonable because he had engaged the law firm to prosecute his suit and he was unaware of any change in the firm's attorneys. *Id.* at 451.

Thus, to find that a plaintiff reasonably relied on its belief that a purported partnership exists, courts generally require more than what MP has alleged here. The Court finds that, as a matter of law, MP's alleged reliance on its belief that CVIN and CENIC were legal partners when it entered into the contracts was unreasonable.

1   Accordingly, MP fails to allege sufficient facts to establish that it reasonably believed that CVIN

2   and CENIC were partners or that it reasonably relied on that belief when it entered into the contracts.

3   *See J.C. Wattenbarger*, 216 Cal. App. 2d at 500-01; *Armato*, 71 Cal. App. 4th at 898-99. MP thus fails

4   to allege facts that show CVIN and CENIC were purported partners under § 16308(a). Thus, all of MP's

5   causes of action against CENIC fail because they are contingent on a finding that CVIN and CENIC are

6   partners under § 16308(a). The Court therefore GRANTS WITHOUT LEAVE TO AMEND CENIC's

7   motion to dismiss because amendment appears futile.[10]

8   **B.   The Member Defendants' Motion to Dismiss.**

9   MP alleges that the Member Defendants are liable for CVIN's conduct as CVIN's alter egos.

10  The Member Defendants move to dismiss all of MP's claims against them on the ground the SAC fails

11  to allege sufficient facts to establish that they are CVIN's alter egos.

12  **1.   Alter Ego Liability.**

13  MP's alter ego theory must be analyzed pursuant to California law. *Matter of Christian & Porter*

14  *Aluminum Co.*, 584 F.2d 326, 337 (9th Cir. 1977). Under California law, "[o]rdinarily, a corporation is

15  regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with

16  separate and distinct liabilities and obligations." *Sonora Diamond Corp. v. Superior Court of Tuolumme*

17  *Cnty*, 83 Cal. App. 4th 523, 538 (2000) (citations omitted); *see also* Cal. Corp. Code §§ 17701.04(a) ("A

18  limited liability company is an entity distinct from its members."), 17703.04.  "A corporate identity may

19  be disregarded—the 'corporate veil pierced'—where an abuse of the corporate privilege justifies holding

20  the equitable ownership of a corporation liable for the actions of the corporation." *Id.* (citations omitted).

21  "Under the alter ego doctrine, then, when the corporate form is used to perpetrate a fraud,

22  circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore

23  the corporate entity and deem the corporation's acts to be those of the persons or organizations actually

24  controlling the corporation, in most instances the equitable owners." *Id.* "The basic rule stated by [the

25  _____

26  [10] The Court need not address CENIC's argument as to whether Fed. R. Civ. P. 9 applies here. *See* Doc. 89 at 15-16.

California] Supreme Court as a guide in the application of [the] doctrine [of alter ego] is as follows:  The

two requirements are (1) that there be such unity of interest and ownership that the separate personalities

of the corporation and the individual no longer exist, and (2) that, if the acts are treated as those of the

corporation alone, an inequitable result will follow." *Associated Vendors, Inc. v. Oakland Meat Co.*,

210 Cal. App. 2d 825, 837 (1962); *see also Automotriz Del Golfo De California v. Resnick*, 47 Cal.2d

792, 796 (1957).

A litany of different circumstances may be sufficient for a finding that an entity is another's alter

ego such that the latter should be liable for the conduct of the former. *See Associated Vendors*, 210 Cal.

App. 2d at 838-40. "Factors that courts have found militated towards finding alter ego liability include

commingling of assets, treatment of the assets of the corporation as the individual's own, failure to

maintain corporate records, employment of the same employees and attorneys, undercapitalization, and

use of the corporation as a shell for the individual." *Ontiveros v. Zamora*, CIV S-08-567LKK/DAD,

2009 WL 425962, at *7 (E.D. Cal. Feb. 20, 2009) (citing *id.*).

Trial courts exercise flexibility and discretion in determining whether the alter ego doctrine

applies in each case. "Issues of alter ego do not lend themselves to strict rules and prima facie cases."

*United States v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774, 777 (9th Cir. 1977). "The conditions

under which the corporate entity may be disregarded, or the corporation be regarded as the alter ego of

the stockholders, necessarily vary according to the circumstances in each case[.]" *Stark v. Coker*, 20

Cal.2d 839, 846 (1942). The alter ego doctrine is "essentially an equitable one." *Id.* The doctrine is,

however, "an extreme remedy, sparingly used." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 539

(citation omitted).

Here, MP argues that the Member Defendants are the alter egos of CVIN such that they should

be liable for CVIN's conduct. MP advances two theories to satisfy the first prong of the alter ego

doctrine test. First, MP alleges that the Member Defendants intentionally undercapitalized CVIN.

Second, MP alleges that Member Defendants used CVIN as a mere shell, instrumentality, or conduit for

their own business. Further, MP argues that recognizing CVIN as separate from the Member Defendants

16

would create an inequitable result, which satisfies the second prong of the alter ego doctrine test.

The Member Defendants do not (and cannot) dispute that both theories are well-recognized theories of alter ego liability. *See Sonora Diamond Corp.*, 83 Cal. App. 4th at 538-39. Rather, the Member Defendants argue that MP has failed to plead either theory with sufficient factual support. Likewise, the Member Defendants assert that MP has failed to allege sufficient facts to demonstrate that "an inequitable result will follow" unless CVIN's corporate identity is disregarded.

### 2. MP's Undercapitalization Theory.

"The obligation to provide adequate capital begins with incorporation and is a continuing obligation thereafter during the corporation's operations." *Hill v. State Farm Mut. Auto. Ins. Co.*, 166 Cal. App. 4th 1438, 1485 (2008) (quoting *Lowell Staats Min. Co. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1263 (10th Cir. 1989)). "Adequate capitalization means 'capital reasonably regarded as adequate to enable [the corporation] to operate its business and pay its debts as they mature.'" *Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Servs., Inc.*, 736 F.2d 516, 524 (9th Cir. 1984) (citations omitted). "Under California law, inadequate capitalization of a subsidiary may alone be a basis for holding the parent corporation liable for acts of the subsidiary." *Slottow v. Am. Cas. Co. of Reading, Penn.*, 10 F.3d 1355, 1360 (9th Cir. 1993). This is so because "[t]he attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity." *Eng'g Serv. Corp. v. Longridge Inv. Co.*, 153 Cal. App. 2d 404, 416 (1957).

The thrust of MP's undercapitalization theory is that, in relation to the Project's risks and actual costs, the Member Defendants intentionally and knowingly undercapitalized CVIN before Project's construction and kept it undercapitalized as the Project progressed. The Member Defendants argue that MP's allegations concerning CVIN's undercapitalization are conclusory. The Member Defendants further argue that MP's allegations are contradictory and inconsistent in that they suggest that CVIN in fact was adequately capitalized. *See* Doc. 91 at 20-24; Doc. 102 at 7-8.

Recognizing that a complaint's inconsistencies and contradictions can cause a plaintiff to plead itself out of a claim, *see Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), the Court

1   first addresses the Member Defendants' assertion that MP's allegations are internally inconsistent and

2   contradictory such that MP's undercapitalization theory is implausible on its face. The Member

3   Defendants' primary argument in this regard is that the SAC's allegations establish that CVIN was

4   adequately capitalized. *See* Doc. 91 at 20. The Member Defendants construe the SAC to allege that

5   CVIN "had access to funds in excess of 99% of the expected contract liability" and "over $1.3 million in

6   cash on hand prior to the commencement of the [P]roject." *Id.* The Member Defendants thus argue that

7   "basic arithmetic reasonably supports a conclusion that a company starting a construction project with at

8   or near the amount of the estimated pre-contract cost was not undercapitalized." *Id.* at 20-21. The

9   Member Defendants assert that MP's undercapitalization theory is further undercut by the SAC's

10   allegations that the Project is nearly complete and that CVIN has "identif[ied] a ready market and paying

11   customers for the [Project's] network." *Id.* at 23.

12        MP argues that the Member Defendants misconstrue the SAC's allegations. MP asserts that the

13   fact that the Project had close to 100% of the anticipated necessary capital prior to the Project's

14   commencement is not dispositive. *See* SAC at ¶ 37. MP claims that CVIN's projected costs of the

15   Project were unreliable and thus the actual costs and liabilities for the Project far exceeded CVIN's

16   anticipated capital. *See id.* at ¶¶ 101, 122, 124, 169-70. Furthermore, although MP alleges that the

17   Member Defendants intended to contribute $13 million to the Project, MP does not allege that they in

18   fact did so. *See* Doc. 99 at 16; SAC at ¶ 96. MP alleges that the fact that CVIN's assets of $1.3 million at

19   the time the Project commenced demonstrate that MP was undercapitalized compared to the risks and

20   obligations inherent in the Project, which was estimated to cost at least $66 million. *See* SAC at ¶¶ 97-

21   98. Further, MP alleges that CVIN's undercapitalization worsened as the true costs of the Project

22   became known, yet the Member Defendants intentionally and knowingly failed to acknowledge the

23   actual costs of the Project and failed to adequately capitalize CVIN in response. *See id.* at ¶¶ 102, 106,

24   124.

25        MP therefore alleges that, from the commencement of the Project through the present, the

26   Member Defendants "organized and carried on the business of CVIN without substantial capital or

1    sufficient assets available to meet prospective liabilities." *See id.* at ¶ 9. MP argues that this is evidenced

2    by the fact that the Project has experienced projected cost overruns of approximately $12 million in the

3    first quarter of 2014 and CVIN's alleged failure to pay MP the $18 million it is due under the contracts.

4    *See id.* at ¶¶ 106, 124, 170, 175-79.

5           In support of their motion, the Member Defendants provide the First Quarter Report of 2014

6    ("the Report") for the Project. *See* Doc. 91-2.[11] The Member Defendants argue that the Report

7    demonstrates that MP's undercapitalization theory is implausible because it establishes that the Project,

8    which cost over $78 million to build, is 98% complete. *See* Doc. 91 at 22-23; Doc. 91-2 at 7.

9           Assuming the truth of the SAC's allegations, as the Court must do at this stage of the litigation,

10   the Court does not find that they are internally inconsistent or contradictory such that MP has pled itself

11   out of a claim. The SAC sufficiently and clearly outlines MP's theory that, because the Project's

12   projected costs were unreliable, the fact that CVIN had close to 100% of the anticipated necessary

13   capital is not dispositive. MP also contests whether the Member Defendants contributed $13 million of

14   the total $66.6 million in anticipated costs for the Project as they intended to do. The SAC also

15   sufficiently pleads MP's theory that, as the Project's construction commenced, the actual costs of the

16   Project worsened and became known to the Member Defendants, yet they failed to infuse CVIN with

17   sufficient capital, which led to significant cost overruns.

18          MP alleges that, because of the Member Defendants' deliberate and intentional conduct, CVIN is

19   currently undercapitalized such that it can no longer satisfy its debts and obligations. Neither the fact

20   that the Project is almost complete nor that the Member Defendants have identified a customer base for

21   the Project is dispositive here. It is wholly plausible that CVIN could complete the Project and have

22   anticipated customers yet currently be unable to meet its debts and obligations due to its lack of

23   capitalization.

24          Moreover, the Report seems to support MP's allegation that the Project's projected cost was an

25

26   ---

   [11] Because MP references the Report in the SAC, *see* SAC at ¶ 76, the Court may consider it. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

unreliable estimate. The Report indicates that the Project had an estimated cost of approximately $66.6 million, but its actual cost at the time the Report was completed was approximately $78.5 million, an approximately 18% difference. The Report also indicates that the approximately $12 million in additional funds for the Project's actual costs were provided, *see* Doc. 91-2 at 7, and that those funds came from "CVIN matching funds." *See id.* at 3, 7.

Assuming that CVIN provided $12 million in "matching funds" to cover the Project's actual costs, MP's undercapitalization theory seemingly would be undercut, but it would not be dispositive as to whether CVIN is currently able to pay its outstanding debts. Likewise, these facts gleaned from the Report are not dispositive of whether the ratio of CVIN's assets compared to the risks and liabilities inherent in the Project (and other CVIN endeavors, if any) rendered CVIN insufficiently capitalized at the start of the Project. *See Laborers Clean-Up*, 736 F.2d at 525 (citations omitted).

In the absence of any authority or undisputed evidence that the circumstances as alleged in the SAC cannot amount to undercapitalization as a matter of law, the Court cannot find that MP's allegations that CVIN was undercapitalized at the outset, that it remained undercapitalized as the Project progressed, or that it is currently undercapitalized are facially implausible. Likewise, the Court does not find that the Report renders MP's allegations facially implausible. Although a close call, the Court finds that MP has pled sufficient facts to demonstrate that its undercapitalization theory is facially plausible. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.

### 3. MP's "Mere Shell, Instrumentality, or Conduit" Theory.

MP's second theory of the Member Defendants' liability as CVIN's alter egos is that they used CVIN as a "mere shell, instrumentality, and conduit" for the Project. This theory of alter ego liability is well-established under California law. *See Associated Vendors*, 210 Cal. App. 2d at 839 (one factor to establish alter ego liability is "the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation") (citing *McCombs v. Rudman*, 197 Cal. App. 2d 46 (1961)).

MP alleges that the Member Defendants are the sole shareholders of CVIN. *See* SAC at ¶¶ 121,

123. MP further alleges that the Member Defendants used CVIN to shield them from risks, costs, and liabilities inherent in the Project while being its only true beneficiaries. Specifically, the Member Defendants allege that Consolidated Communications, one of the Member Defendants, explicitly reported its ownership interests in and control of CVIN. MP alleges that:

> Consolidated Communications has reported in its quarterly report "We have a 12.86% interest in [CVIN], a *joint enterprise* comprised of affiliates of several independent telephone companies located in central and northern California . . . . Because we have *significant influence* over the operating and financial policies of this entity, we account for this investment using the equity method." In its other quarterly reports in 2013, Consolidated Communications affirmed its partnership with CVIN and its ownership interest and "significant influence over the operating and financial policies" of CVIN. In its 2014 quarterly report, Consolidated [Communications] reported a 13.455% interest in CVIN, LLC, and repeated its previous statements that it has significant influence over the operating and financial policies of CVIN.

*Id.* at ¶¶ 115-17 (emphasis added).

"An allegation that a person owns all of the corporate stock and makes all of the management decisions is insufficient to cause the court to disregard the corporate entity." *Leek v. Cooper*, 194 Cal. App. 4th 399, 415 (2011) (citing *Meadows v. Emett & Chandler*, 99 Cal. App. 2d 496, 499 (1950)). Nonetheless, "[s]ole ownership alone is often enough to defeat a motion to dismiss." *Pac. Mar. Freight, Inc. v. Foster*, 10–CV–0578–BTM–BLM, 2010 WL 3339432, at *6 (S.D. Cal. Aug.24, 2010) (citing *Paul v. Palm Springs Homes, Inc.*, 192 Cal. App. 2d 858, 863 (1961)); *but see Katzir's Floor & Home Design, Inc. v. M–MLS.COM*, 394 F.3d 1143, 1149 (9th Cir. 2004) (stating that "[t]he mere fact of sole ownership and control does not eviscerate the separate corporate identity that is the foundation of corporate law"). MP alleges that the Member Defendants are the only owners of CVIN, that CVIN is a "joint enterprise" between them, that at least one of them (Consolidated Communications) exerts "significant influence" over CVIN's "operating and financial policies," that they intentionally kept CVIN undercapitalized, and that they would bear none of the risks of the Project while exclusively receiving its benefits. Although again a close call, the Court finds that the SAC provides sufficient facts to demonstrate that its "mere shell, instrumentality, or conduit" theory is facially plausible.

Taken together, the Court finds that MP's undercapitalization and "mere shell, instrumentality, and conduit" theories provide enough facts from which a plausible inference could be drawn that the

1   Member Defendants are CVIN's alter ego. *See Associated Vendors*, 210 Cal. App. 2d at 837; *Pac. Mar.*

2   *Freight, Inc. v. Foster*, 10-CV-0578-BTM-BLM, 2010 WL 3339432, at *6 (S.D. Cal. Aug. 24, 2010)

3   (noting that "[t]he identification of the elements of alter-ego liability plus two or three factors has been

4   held sufficient to defeat a 12(b)(6) motion to dismiss"). MP therefore has satisfied the first prong of the

5   alter ego doctrine test. *Associated Vendors*, 210 Cal. App. 2d at 837.

6       **4.**    **Inequitable Result.**

7       To state a claim against the Member Defendants based on an alter ego theory of liability, MP

8   also must allege facts demonstrating that an inequitable result will follow unless the Court disregards

9   CVIN's corporate separateness. The California Supreme Court has made clear that undercapitalization

10   alone may be sufficient to lead to an inequitable result holding that:

11       If a corporation is organized and carries business without substantial capital in such a way that
    the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable

12       that shareholders should set up such flimsy organization to escape personal liability. The attempt
    to do corporate business without providing any sufficient basis of financial responsibility to

13       creditors is an abuse of the separate entity and will be ineffectual to exempt shareholders from
    corporate debts. It is coming to be recognized as the policy of the law that shareholders should in

14       good faith put at the risk of the business unincumbered capital reasonably adequate for
    prospective liabilities. If the capital is illusory or trifling compared with the business to be done

15       and the risks of loss, this is a ground for denying the separate entity privilege.

16   *Resneck*, 47 Cal.2d at 797. Thus, "the status of an entity as undercapitalized is an independent basis for

17   inequitable result" under the alter ego doctrine. *Dollar Tree Stores, Inc. v. Toyama Partners, LLC*, No.

18   C 10-325 SI, 2011 WL 872724, at *2 (N.D. Cal. Mar. 11, 2011) (citing *United States v. Healthwin-*

19   *Midtown Convalescent Hosp. & Rehab. Ctr., Inc.*, 511 F. Supp. 416, 420 (C.D. Cal. Mar. 25, 1981)).

20       Because the Court finds that MP may proceed on its undercapitalization theory, the Court also

21   finds that MP has satisfied the second prong of the alter ego doctrine test. *See id.*; *Slottow*, 10 F.3d at

22   1360. Accordingly, the Court DENIES the Member Defendants' motion to dismiss. This holding,

23   however, should not be read to indicate that a Rule 56 motion will not decide this case.

24       **V. <u>CONCLUSION AND ORDER</u>**

25       For the foregoing reasons, the Court ORDERS that:

26       **1.**    CENIC's motion to dismiss (Doc. 89) is GRANTED WITHOUT LEAVE TO AMEND;

and

**2.**     The Member Defendants' motion to dismiss (Doc. 91) is DENIED.


IT IS SO ORDERED.

Dated:   __**October 7, 2014**__            ___**/s/ Lawrence J. O'Neill**___
                                                          UNITED STATES DISTRICT JUDGE