# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MP NEXLEVEL OF CALIFORNIA, INC., | 1:14-cv-288-LJO-EPG |
| Plaintiff, | MEMORANDUM DECISION AND ORDER RE MOTION FOR SUMMARY JUDGMENT (Doc. 278) |
| v. | |
| CVIN, LLC, et al., | |
| Defendants. | |

## I. PRELIMINARY STATEMENT TO PARTIES AND COUNSEL

Judges in the Eastern District of California carry the heaviest caseloads in the nation, and this Court is unable to devote inordinate time and resources to individual cases and matters. Given the shortage of district judges and staff, this Court addresses only the arguments, evidence, and matters necessary to reach the decision in this order. The parties and counsel are encouraged to contact the offices of United States Senators Feinstein and Boxer to address this Court's inability to accommodate the parties and this action. The parties are required to reconsider consent to conduct all further proceedings before a Magistrate Judge, whose schedules are far more realistic and accommodating to parties than that of U.S. Chief District Judge Lawrence J. O'Neill, who must prioritize criminal and older civil cases.

Civil trials set before Chief Judge O'Neill trail until he becomes available and are subject to suspension mid-trial to accommodate criminal matters. Civil trials are no longer reset to a later date if Chief Judge O'Neill is unavailable on the original date set for trial. Moreover, this Court's Fresno Division randomly and without advance notice reassigns civil actions to U.S. District Judges throughout

1

1    the nation to serve as visiting judges. In the absence of Magistrate Judge consent, this action is subject to

2    reassignment to a U.S. District Judge from inside or outside the Eastern District of California.

3    ## II. <u>INTRODUCTION</u>

4    This case concerns disputes that arose over a large-scale broadband infrastructure construction

5    project ("the Project") throughout California's Central Valley. *See* Doc. 84, Plaintiff's Second Amended

6    Complaint ("SAC"), at ¶ 1. The goal of the Project is to create an approximately 1,371-mile broadband

7    fiber network through 18 Central Valley counties. *Id.* at ¶ 22. Because of various ongoing disputes that

8    arose during the construction of the Project, MP Nexlevel of California, Inc. ("MP") brought this suit

9    against CVIN, LLC ("CVIN") d/b/a Vast Networks, among others.

10   In response, CVIN asserts a number of counterclaims against MP. *See* Doc. 94.[1] In its eighteenth

11   counterclaim, CVIN alleges that MP did not have a proper and valid contractor's license when

12   perfoming its work on the Project and, accordingly, CVIN is entitled to recover all compensation it paid

13   to MP for its work on the Project under California Business and Professions Code § 7031(b) ("§

14   7031(b)").[2] *Id.* at ¶¶ 180-83.

15   Currently before the Court is MP's motion for summary judgment on that counterclaim. Doc.

16   278. The Court took the matter under submission on the papers Local Rule 230(g). For the following

17   reasons, the Court DENIES MP's motion.

18   ## III. <u>RULING ON OBJECTIONS</u>

19   The Court notes at the outset that the parties have lodged an enormous number of evidentiary

20   objections. *See generally* Docs. 343-347; 353-366. In fact, there are relatively few pieces of evidence to

21   which the parties do not object. The Court has carefully reviewed the objections and need only consider

22   them to the extent the objected-to evidence is material to the Court's ruling. *See Norse v. City of Santa*

---

24   [1] In its pleading, CVIN asserts counterclaims against MP and crossclaims against another party not involved in this motion. The Court will refer to CVIN's pleading as "CVIN's Claims" for brevity's sake.

25   [2] All further statutory references are to California's Business and Professions Code unless otherwise indicated.

*Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (en banc) (holding district court "must also rule on evidentiary objections that are material to its ruling"). The parties' objections are OVERRULED unless otherwise indicated, either explicitly or by the Court's not addressing objected-to evidence below.

## IV. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed. The Project is divided into 30 geographical "Segments." SAC at ¶ 28. The Segments were constructed on public road rights-of-way owned and controlled by various state and local governments. Doc. 352, CVIN's Separate Statement of Disputed Facts ("SSDF"), at ¶ 13. "Significant portions of each of the Segments were constructed in areas subject to the jurisdiction of the California Department of Transportation ('Caltrans')." SSDF at ¶ 13.

MP performed work on Segments 8, 10, 12, 13, 14, 15, 18, 19, 21, 22, 25, 26, 26, and 30 (collectively, "the Segments"). CVIN's Claims at ¶ 8. Beginning in November 2011, MP and CVIN entered into a separate contract for each Segment, *id.* at ¶ 7, though "[t]he terms and conditions of each of the written contracts . . . are essentially identical except for the quantities, unit prices, fixed sum to be paid to MP Nexlevel, and dates of execution." *Id.* at ¶ 10. The parties entered into contracts for Segments 10, 12, 13, 15, 18, and 30 on November 18, 2011. Doc. 206, Declaration of Anthony Sturtz ("Sturtz Decl.") at ¶ 3; Sturtz Decl., Exs. A-F. In January 2012, they entered into contracts for Segments 8 and 14. Sturtz Decl. at ¶ 4. On March 23, 2012, they entered into a contract for Segment 22. *Id.* And on May 2, 2012, they entered into contracts for Segments 19, 21, 25, 26, and 27. Doc. 199, Joint Statement of Undisputed Facts ("JUF"), at ¶ 4.

Each contract explained that

[CVIN] has been awarded a grant by the Broadband Technology Opportunities Program ("BTOP") administered by the National Telecommunications and Information Association ("NTIA") to design and construct the [Project] . . . The [Project], as defined herein, consists of a 1,371 mile fiber backbone network through 18 Central Valley counties. The network will provide internet backbone service to these counties and will construct 12 new wireless nodes in order to deploy WiMax last mile service to rural portions of Fresno, Tulare, Kings and Kern counties.

Doc. 208, Ex. A, CVIN LLC Construction Agreement ("Project Contract"), at 1. The contracts required

that MP be "a licensed California general contractor." *Id.*; JUF at ¶ 18. When submitting its bids for the contracts, MP was asked to provide its "California General Contractor License" number. SSDF at ¶ 17. MP stated on the bid form: "California Contractor's License is #907019," referring to its C-7 Low Voltage Systems license ("C-7 license"), which it had obtained from the California Contractors State License Board ("the Board") in November 2007. *See* Doc. 201, Ex. A at 1; SSDF ¶ 17.

On May 2, 2012, MP received a Class A General Engineering Contractor's license ("Class A license") from the Board. *Id.* Louis-George Menard was listed as MP's "responsible managing employee" ("RME") for the license. *See* Doc. 201, Ex. A at 1. Both of MP's licenses remained effective through July 29, 2014, when MP was no longer performing any work for CVIN. *Id.*; JUF at ¶ 2.

The Project had two phases: (1) underground construction and excavation for the installation of conduit ("the Underground Phase") and (2) the installation of fiber optic cable into the conduit. SSDF at ¶ 3. MP bid to perform work on both phases; however, CVIN awarded contracts to MP for only the first phase. *Id.* at ¶ 4; *see also, e.g.*, Sturtz Decl., Ex. J at 7 (MP's bid for both phases on Segment 8). The first phase "constituted only a portion of the work to be performed on the Project in order to successfully complete the installation of the network," SSDF at ¶ 8, and had to be completed before the second phase could begin. *See* SSDF at ¶¶ 3, 9; Doc. 329 at 13. After the first phase was completed, CVIN completed the second phase itself. SSDF at ¶ 9; Doc. 329 at 13.

"[T]he majority of [MP's] work for CVIN involved burying conduit underground." Sturtz Decl. at ¶ 17. Pursuant to the parties' contracts, MP was required "to perform underground construction, including trenching and [Horizontal Directional Drilling ("HDD")]/boring, excavate, compact and backfill trenches, and pour over roadway sections where it had trenched." SSDF at ¶ 5.

CVIN created specifications for the construction of the Underground Phase. *See* Doc. 322, Declaration of James Twineham ("Twineham Decl."), Ex. 7, "CVNGBIP Underground Plant Construction Specifications" ("the Specifications"). The purpose of of the Specifications was to provide "CVIN, consulting engineers, contractors and other interested parties with information on the

construction of [the Underground Phase]." *Id.* at p. 1. The "information and recommendations in [the Specifications] [were] mandatory," and explained that "[d]eviations from [them] shall be made only with the prior written approval of the engineer and/or owner." *Id.* at ¶ 5.

For instance, the Specifications provided detailed background and guidance on "Trench Excavating, Grading, and Conduit Laying." Specifications at ¶ 10. The Specifications defines a trench as including "those conditions in which a conduit is installed in a relatively narrow ditch that has been cut in undisturbed soil and the ditch is backfilled[3] to the original level," and explained that "[t]renching is accomplished with the use of some type of mechanical machine, backhoe, trencher, rock saw or plow, operated by a reliable professional operator." *Id.* at ¶ 10.1. The conduit depth for the Project was 36 inches unless otherwise specified, with a minimum conduit radius of 30 inches. *Id.* at ¶ 10.2.

The Specifications also provided requirements and guidance for HDD. *See id.* at ¶¶ 11, 13.4. Among other things, the Specifications mandated that:

> The horizontal directional drill machine shall consist of a hydraulically powered system to rotate, push, and pull, hollow drill pipe into the ground at a variable angle while delivering a pressurized fluid mixture to a guidable drill head. The machine shall be anchored to the ground to withstand the pulling, pushing and rotating pressure required to complete the crossing. The hydraulic power system shall be self-contained with sufficient pressure and volume to power boring operations.

*Id.* at ¶ 11.3.1.[4]

MP began construction on Segments 8, 10, 12, 13, 14, 15, 18, 22, and 30 prior to May 2, 2012 (*i.e.*, before it received its Class A license), SSDF at ¶ 14, and began construction on Segments 19, 21, 25, 26, and 27 on or after May 3, 2012 (*i.e.*, on the day it received its Class A license or after). JUF at ¶ 4.

---

[3] Backfill means "to refill (as an excavation) usually with excavated material." *See* Merriam-Webster, http://www.merriam-webster.com/dictionary/backfill.

[4] HDD "allows construction workers to avoid digging up streets and sidewalks." *Digital Control, Inc. v. McLaughlin Mfg. Co., Inc.*, 213 F. Supp. 2d 1242, 1244 (W.D. Wash. 2002). HDD uses "[a] drilling machine . . . to push and drill a pilot hole at an angle into the ground, and then to advance the borehole horizontally until the desired location is reached. It is then redirected, still in a forward direction, so that it resurfaces at a different location." Environmental Science Deskbook, §5:32.12, *Drilling—Horizontal directional drilling*.

5

## V. STANDARD OF DECISION

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *See id.* at 255; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249-50. A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

The moving party bears the initial burden of informing the Court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(c); *Liberty Lobby*, 477 U.S. at 250.

## VI. ANALYSIS

Section 7031 bars contractors from any recovery or compensation for work requiring an appropriate contractor's license unless he or she was "duly licensed" at all times throughout the performance of the work. *See MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.*, 36 Cal. 4th 412, 426 (2005). MP's motion requires the Court to determine whether its C-7 and Class A

1   licenses rendered it a "duly licensed contractor," as § 7031(a) requires, while it performed its work on

2   the Project. *See Pac. Caisson & Shoring, Inc. v. Bernards Bros., Inc.*, 198 Cal. App. 4th 681, 688

3   (2011). Because this is an issue of statutory interpretation, it may be resolved on summary judgment.

4   *See Padilla v. Arroyo Maintenance Corp.*, 2002 WL 1091623, at *6 (Cal. Ct. App. 2002).

5   **A.     MP's C-7 license was insufficient.[5]**

6           MP claims it was duly licensed to perform its work on the Project by virtue of its C-7 license,

7   which it obtained prior to and maintained throughout its performance on the Project. The Board defines

8   a licensed C-7 "Low Voltage Systems Contractor" as follows:

> A communication and low voltage contractor installs, services and maintains all types of
> communication and low voltage systems which are energy limited and do not exceed 91 volts.
> These systems include, but are not limited to telephone systems, sound systems, cable television
> systems, closed-circuit video systems, satellite dish antennas, instrumentation and temperature
> controls, and low voltage landscape lighting. Low voltage fire alarm systems are specifically not
> included in this section.

Cal. Code Regs., tit. 16, § 832.07 ("§ 832.07").

            There is no dispute that the Project's fiber optic cable does not exceed 91 volts. Although the

parties dispute whether the Project qualifies as a "communication system" and whether MP's work

constitutes the installation of a communication system, the Court need not resolve these issues. Even

assuming MP's work qualifies as the installation of a communication system under § 832.07, the means

by which MP performed its work—namely, trenching and HDD/boring—was outside the scope of its C-

7 license. As a result, MP was not a "duly licensed contractor" under § 7031 when it performed work on

the Project with only its C-7 license.

            MP proffers two primary arguments to support its position that its C-7 license rendered it duly

licensed to perform its Project work. First, MP argues that "[a] C-7 license does not limit the manner or

method in which a C-7 contractor can install a communication system," and therefore MP was permitted

to install the Project's fiber optic cable by any means. Doc. 198 at 16. Second, MP argues that any work

---

[5] There is no dispute that MP's C-7 license was valid at all relevant times. *See* Doc. 350 at 9.

1    outside the scope of its C-7 license was "incidental and supplemental" as contemplated by § 7059.[6] *Id.* at

2    17.

3          MP provides no authority for its interpretation of § 832.07. In fact, MP simply argues in an

4    entirely conclusory manner that because § 832.07 does not limit the method by which a low voltage

5    system may be installed, then "no method of installation would be beyond the scope of the license."

6    Doc. 198 at 16. Although there is admittedly limited relevant authority on this issue, all of it suggests

7    MP's interpretation is incorrect.

8          First, the plain meaning of "install" in § 832.07 does not reasonably extend to MP's alleged

9    "installation" of the Project's fiber optic cable via excavating, trenching, and boring the ground. The

10   Court acknowledges that fiber optic cables could be "installed" underground by these means. *See* Cal.

11   Code Regs., tit. 16, § 832.34 ("A pipeline contractor . . . installs pipelines . . . including . . . [via]

12   trenching, boring . . . necessary to complete the installation of such pipelines."). But, in the context of §

13   832.07, "install" is more reasonably understood to mean to place, connect, or adjust something into

14   position for use.[7] This understanding of "install" makes sense in light of the systems enumerated in §

15   832.07— "telephone systems, sound systems, cable television systems, closed-circuit video systems,

16   satellite dish antennas, instrumentation and temperature controls, and low voltage landscape lighting"—

17   which appear to be those that are normally installed in buildings.

18         The California Court of Appeal has indicated that the Board-published study guides for license

19   examinations provide guidance as to whether certain work falls within a license's scope. *See Ron Yates*

---

[6] Section 7059(a) provides in relevant part:

   Nothing contained in this section shall prohibit a specialty contractor from taking and executing a contract involving the use of two or more crafts or trades, if the performance of the work in the crafts or trades, other than in which he or she is licensed, is incidental and supplemental to the performance of the work in the craft for which the specialty contractor is licensed.

[7] *See, e.g.*, "install," Merriam-Webster, http://www.merriam-webster.com/dictionary/install ("to make (a machine, a service, etc.) ready to be used in a certain place"); "install," Dictionary.com, http://www.dictionary.com/browse/install ("to place in position or connect for service or use: to install a heating system"); "install," Oxford's English Dictionary,  ("To place (an apparatus, a system of ventilation, lighting, heating, or the like) in position for service or use").

*Constr. Co. v. Superior Court*, 186 Cal. App. 3d 337, 347-48 (1986); *Pac. Caisson & Shoring, Inc. v. Bernards Bros, Inc.*, 198 Cal. App. 4th 681, 691-92 (2011).[8] Certain Board study guides for C-class licenses further suggest that MP's work does not fall within the ambit of its C-7 license. For instance, the C-7 study guide—which is admittedly only two pages long—does not mention anything remotely approximating the construction MP performed. *See* Contractors State License Board License Examination Study Guide, Low Voltage (C-7), *available at* http://www.cslb.ca.gov/Resources/Study Guides/C07StudyGuide.pdf. The study guide does, however, indicate that 18% of the test will concern "Component Installation," which involves questions about "install[ing] equipment room components . . . satellite, CCTV, telephone, data, instrumentation, battery (backup), audio video, and fiber optic systems." *Id.* at 1. The study guide recommends the following educational resources: *BICSI: Residential Network Cabling*; *Home Satellite TV Installation and Troubleshooting Manual*; and *TIA/EIA Telecommunications and Building Wiring Standards*. *Id.* at 2. All of this lends further support to the Court's understanding that, as contemplated in § 832.07, "installation" means the placement of equipment in, on, and around buildings.

The Board-issued study guide for the C-34 license examination, on the other hand, indicates that the examination concerns pipeline planning, installation, removal, and repair. *See* Contractors State License Board License Examination Study Guide, Pipeline (C-34), *available at* http://www.cslb.ca.gov/ Resources/StudyGuides/C34StudyGuide.pdf. The three sample questions ask: (1) "Using a load factor of 50%, how many 10-yard dump truck loads are required to export 6" of paving removed from a 120' x 4' trench?"; (2) "What method should be used to install electrical and telephone conduits in the same trench?"; and (3) "When replacing pavement over a trench, what is meant by 'overcutting'?" *Id.* at 2. The study guide recommends the following educational resources: *Moving the Earth: The Workbook of Excavation*; *Pipe and Excavation Contracting Revised*, and *Trenchless Technology Piping: Installation*

---

[8] For this reason, the Court rejects MP's request that the Court not take judicial notice of the Board's study guides. *See* Doc. 366.

1    *and Inspection. Id.* All of this suggests that installing conduits via trenching is covered by the C-34

2    license—but not the C-7 license—which comports with the Board's definition of a C-34 Pipeline

3    Contractor as one who

4        fabricates and installs pipelines for the conveyance of fluids, such as water, gas, or petroleum, or
         for the containment or protection of any other material, including the application of protective
5        coatings or systems and the trenching, boring, shoring, backfilling, compacting, paving and
         surfacing necessary to complete the installation of such pipelines.

6    Cal. Code Regs., tit. 16, § 832.34.

7        An August 2007 notice from CalTrans suggests that C-7 license holders may not perform HDD

8    or, more specifically, that only those with a Class A or C-34 license may do so. *See* CalTrans,

9    *Horizontal Directional Drilling Operations in State R/W, available at* http://www.dot.ca.gov/trafficops/

10   ep/docs/HDD_Contractors_Notice.pdf. The notice states in relevant part:

11       In order to work anywhere in the State of California and perform Horizontal Directional Drilling
         (HDD) operations for the purpose of installing an "encasement" or "product pipe/conduit
12       underground" for the proposed use of gas, water, electrical, telecommunications, sewer, etc.,
         YOU ARE REQUIRED TO HAVE AN "A" OR "C-34" CONTRACTORS LICENSE.
13

14   *Id.* at 1.[9] Although the Court need not and does not assume CalTrans's understanding of the relevant law

15   is correct or authoritative, that CalTrans understands HDD to be within only the province of Class A and

16   C-34 licenses provides further support for the Court's conclusion that the C-7 license does not cover

17   HDD.

18       In summary, MP provides no authority for its interpretation of the scope of its C-7 license, and

19   all of the authority the Court can locate indicates that its interpretation is incorrect. MP has failed to

20   show that all of its work on the Project was covered by its C-7 license.

21

22   ─────────────────────

23   [9] MP objects to CVIN's request that the Court take judicial notice of this document. *See* Doc. 366 at 2. MP argues that the
     document's publication and effective date are not on the face of the document, so it is "unclear if this document was available
     when the Project was underway." *Id.* MP is incorrect. The document is available on the California Department of
     Transportation website and indicates that it was released in August 2007. *See* http://www.dot.ca. gov/trafficops/ep/apps.html
24   (under "New Policy" link). MP also argues that various terms in the document are ambiguous and therefore the entire
     document is not subject to judicial notice. There is nothing ambiguous about the notice's language stating CalTrans's opinion
     that to perform HDD for the purpose of installing conduit underground for the proposed used of telecommunications
25   anywhere in California, an "A" or "C-34" contractors license is required.

1    MP argues that if its work was not covered by its C-7 license, it was permissible as "incidental

2    and supplemental" to covered work because "all work performed by MP . . . had the sole and exclusive

3    purpose of installing a communications system." Doc. 198 at 18. Section 7059(a) provides in relevant

4    part:

5        Nothing contained in this section shall prohibit a specialty contractor from taking and executing
         a contract involving the use of two or more crafts or trades, if the performance of the work in the
6        crafts or trades, other than in which he or she is licensed, is incidental and supplemental to the
         performance of the work in the craft for which the specialty contractor is licensed.

7
     As a threshold matter, MP has failed to demonstrate that *any* of its work fell within the scope of its C-7
8
     license. MP makes no meaningful argument about the specific work it performed and whether it was
9
     covered by its C-7 license; MP essentially argues all of its work was so covered. Nonetheless, assuming
10
     MP's C-7 license covered at least some of its work on the Project, the question, then, is whether the
11
     remainder of its work—for instance, its HDD/boring, trenching, and excavating—may be considered
12
     "incidental and supplemental" under § 7059.
13
         The Board defines "incidental and supplemental" work as that which "is essential to accomplish
14
     the work in which the contractor is classified." Cal. Code Regs., tit. 16, § 831. There is admittedly
15
     limited guidance about what qualifies as "incidental and supplemental." The Court can locate only two
16
     published decisions that have discussed the issue—*Currie v. Stolowitz*, 169 Cal. App. 2d 810 (1959),
17
     and *Roy Bros. Drilling Co. v. Jones*, 123 Cal. App. 3d 175, 183 (1981). The Court agrees with MP that
18
     "*Currie* is not particularly instructive." Doc. 198 at 18. In that case, the plaintiff held various "C" class
19
     licenses for heating, ventilating, or air conditioning work. *Id.* at 812. Observing that "incidental" and
20
     "supplemental" generally meant "necessary to the main purpose," the court held, without any detailed
21
     explanation, that the plaintiff's plumbing work was not "incidental and supplemental" to its heating,
22
     ventilating, or air conditioning work and therefore he was not "duly licensed" to perform the plumbing
23
     work. *Id.*
24
         *Roy Bros.* is likewise not particularly helpful. In *Roy Bros.*, the court held that a C-42 license
25

11

1   holder, who is permitted to "excavate" in order to install sewage structures, was not licensed to drill

2   holes to install caissons to support a home's foundation. 123 Cal. App. 3d at 184-85. The court found

3   that the work was "in no way incidental and supplemental to" work related to sewage structures. *Id.* at

4   185. The contractor therefore was not duly licensed to perform the work. *Id.*

5          Relying exclusively on *Currie*, MP argues that its work, if not covered by its C-7 license, should

6   be construed as "incidental and supplemental" under § 7059 because all of it was necessary to the main

7   purpose of installing a communications system. MP essentially argues that *anything* that is alleged to be

8   necessary to install a communications system should qualify as permissible "incidental and

9   supplemental" work. The Court cannot locate—and MP does not provide—any authority for such a

10  broad interpretation.

11         Accepting MP's interpretation of § 832.07 and what constitutes permissible "incidental and

12  supplemental" work would lead to absurd results. According to MP, a C-7 license holder should be able

13  to do *anything* so long as it is related to the end goal of installing a low voltage system. *See* Doc. 198 at

14  16 (arguing that a "C-7 license does not limit the manner or method in which a C-7 contractor can install

15  a communication system"). If MP's understanding were correct, taken to its logical extreme, a C-7

16  license holder would be permitted to build a house so that, when complete, he or she could install a

17  satellite dish on top of it. A C-7 license holder would likewise be permitted to install stadium light

18  infrastructure so long as it is ultimately equipped with a low voltage system. And, according to MP, the

19  same licensee should be able to dig trenches with any kind of machinery or technique if deemed

20  necessary to install cable television lines.

21         This cannot be the case. Put bluntly, the Court cannot locate any authority that remotely supports

22  MP's position. California's "comprehensive legislative scheme," which is "designed to protect the

23  public from incompetent or dishonest providers of building and construction services," *Alatriste v.*

24  *Cesar's Exterior Designs, Inc.*, 183 Cal. App. 4th 656, 664 (2010), would be eviscerated if a C-7 license

25  holder were permitted to install a communications system however he or she so desired. This federal

12

1   district court does not have the ability (or willingness) to create the dramatic expansion of California law

2   that would follow if the Court accepted MP's sweeping, limitless interpretation of § 832.07 and what

3   qualifies as "incidental and supplemental" work under § 7039. The Court therefore DENIES MP's

4   motion for summary judgment to the extent that the motion is based on MP's position that its C-7

5   license was sufficient.

6   **B.      Whether MP's Class A license was valid.**

7       MP contends it is entitled to summary judgment on CVIN's claim that MP's Class A license was

8   invalid. MP, as a corporation, may qualify for a California contractors license only through an individual

9   acting as its RME or "responsible managing officer" ("RMO").[10] *See* § 7068(b)(3); *Acosta v. Glenfed*

10  *Dev. Corp.*, 128 Cal. App. 4th 1278, 1299 (2005). If "the RME is not performing his function, it is as if

11  the contractor has no license at all." *Buzgheia v. Leasco Sierra Grove*, 60 Cal. App. 4th 373, 387 (1997).

12  But "[i]f the individual is continuously associated with the entity by exercising direct supervision and

13  control, the entity is deemed to have a valid license." *Mehrabian*, 2007 WL 476059, at *5 (footnote

14  omitted).

15      An RME "is a bona fide employee of the applicant and is actively engaged in the classification

16  of work for which that responsible managing employee is the qualifying person in behalf of the

17  applicant." § 7068(d). A bona fide employee, in turn, is "an employee who is permanently employed by

18  the employer and is actively engaged in the operation of the applicant's contracting business for at least

19  32 hours or 80% of the total hours per week such business is in operation, whichever is less." Cal. Code

20  Regs., tit. 16, § 823. The RME  "shall be responsible for exercising that direct supervision and control of

21  his or her employer's or principal's construction operations as is necessary to secure full compliance

22  with" the licensing laws and the Board's rules and regulations. § 7068.1; *Subcrete Const., Inc. v.*

23  *Mehrabian*, 2007 WL 476059, at *5 (Cal. Ct. App. 2007). The RME therefore must exercise "direct

24  _____

25  [10] For purposes of MP's motion, the titles RME and RMO are interchangeable.

supervision over the work for which the license issued to the extent necessary to secure full compliance with the provisions of the law." *Wright v. Issak*, 149 Cal. App. 4th 116, 1123 (2007). "Direct supervision and control" includes "supervising construction, managing construction activities by making technical and administrative decisions, checking jobs for proper workmanship, or direct supervision on construction job sites." Cal. Code Regs., tit. 16, § 823(b).

The parties dispute whether Menard, who was listed as MP's RME for its Class A license, exercised "direct supervision and control" over MP's work on Segments 19, 21, 25, 26, and 27, such that he was in fact MP's RME, thereby rendering MP's Class A license valid and MP "duly licensed" to perform that work.[11] Among other things, the parties dispute the amount of time Menard spent working on the Project, the extent to which he had decisionmaking authority over the Project, the extent to which he advised and made recommendations to individuals MP's Project managers, and the extent to which he was apprised of relevant information concerning the Project. *See, e.g.*, SSDF at ¶¶ 62, 66, 67, 72, 74-75, 79-80, 83, 85, 91-93.

Whether Menard's work constituted "direct supervision and control" over the Project is a question of fact for a jury to decide. *See Jeff Tracy, Inc. v. City of Pico Rivera*, 240 Cal. App. 4th 510, 519 (2015) ("A variety of activities can constitute direct supervision and control [under Cal. Code Regs., tit. 16, § 823]. All of these are factual questions that should have been submitted to a jury for determination."); *see also G.E. Hetrick & Assocs.*, 11 Cal. App. 4th 318, 339 (1992) (plaintiff's purported RME's declaration describing himself as plaintiff's RME coupled with plaintiff's contractor's license listing declarant as RME created issue of fact as to whether declarant was plaintiff's RME). The Court therefore cannot determine at this stage of the litigation whether MP was "duly licensed" by virtue of its Class A license.

## VII. **CONCLUSION AND ORDER**

---

[11] CVIN does not dispute that MP's Class A license covered the work MP performed after it received its Class A license.

Because MP has failed to show that its work on the Project fell within the scope of its C-7 license and genuine issues of material fact exist as to whether its Class A license was valid, the Court DENIES MP's motion for summary judgment. (Doc. 278).

IT IS SO ORDERED.

Dated:   __July 19, 2016__                    _____/s/ Lawrence J. O'Neill_____
                                               UNITED STATES CHIEF DISTRICT JUDGE